# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 9, 2020　　　　Decided February 9, 2021

No. 19-5254

FRESNO COMMUNITY HOSPITAL AND MEDICAL CENTER,
DOING BUSINESS AS COMMUNITY REGIONAL MEDICAL
CENTER, ET AL.,
APPELLANTS

v.

NORRIS COCHRAN, ACTING SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00867)

*Katrina A. Pagonis* argued the cause for appellants. With her on the briefs was *Robert L. Roth. John R. Hellow* entered an appearance.

*Karen Schoen*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Michael S. Raab*, Attorney, *Robert P. Charrow*, General Counsel, U.S. Department of Health & Human Services, *Brenna E. Jenny*, Deputy General Counsel and Chief Legal Officer - CMS, *Janice L. Hoffman*, Associate General Counsel, and *Susan Maxson Lyons*, Deputy Associate General Counsel for Litigation.

Before: WILKINS and KATSAS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*:    When Medicare overpays hospitals, it offsets that mistake by reducing future payments.  A group of hospitals challenges one such reduction.  We must decide whether we have jurisdiction.

I.

By 2013, Medicare was out $11 billion.  The backstory?  A tortuous tale — familiar to the parties — involving new diagnostic codes and bookkeeping that did not keep up.[1]  But for purposes here, the story begins when Congress gave the Secretary of Health and Human Services a mission: recoup all $11 billion by the end of fiscal year 2017.  *See* American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 631(b)(2)(A)(ii)(IV), 126 Stat. 2313, 2353 (2013).

Congress's orders were simple.    To recoup the overpayments, the Secretary must reduce the base rate (or "standardized amount," in Medicare jargon) paid for inpatient care.  *See id.*  (In essence, Medicare would dock hospitals' pay to offset the accidental advance.)  After running the numbers, the Secretary opted to adjust the base rate gradually: -0.8% in 2014, -1.6% in 2015, -2.4% in 2016, and (if all went according

---

[1] Those curious about the Inpatient Prospective Payment System, the Medicare Severity Diagnosis-Related Group classifications, and resulting payment woes will find all that and more ably recounted in District Judge Kollar-Kotelly's opinion below.  *See Fresno Cmty. Hosp. & Med. Ctr. v. Azar*, 370 F. Supp. 3d 139 (D.D.C. 2019).

to plan) a net -3.2% adjustment in 2017. *See* 78 Fed. Reg. 50,496, 50,515 (Aug. 19, 2013).

Meanwhile, Congress was looking ahead to 2018. After recouping the $11 billion, the Secretary expected to zero out the adjustment right away. *See id.* But Congress had other ideas. Instead of making "the adjustment (estimated to be an increase of 3.2 percent) that would otherwise apply," Congress told the Secretary to adjust the base rate by 0.5% each year through 2023. *See* Medicare Access and CHIP Reauthorization Act of 2015, Pub. L. No. 114-10, § 414(1)(B)(iii), 129 Stat. 87, 163 (2015). In other words, the Secretary would slowly phase out the recoupment adjustments: -2.7% in 2018, -2.2% in 2019, -1.7% in 2020, -1.2% in 2021, -0.7% in 2022, and -0.2% in 2023. (Congress said nothing about the leftover -0.2%.)

Things went smoothly until 2016, which brought two further changes. First, while reviewing the 2017 budget, the Secretary realized that a -3.2% adjustment would leave the agency short of its $11 billion goal. So to stay on track, the Secretary announced a -3.9% adjustment — 0.7% more than planned. *See* 81 Fed. Reg. 56,762, 56,783–85 (Aug. 22, 2016). Shortly thereafter, Congress made the second change. Fine-tuning its earlier orders, Congress told the Secretary to increase the base rate by 0.4588% (not 0.5%) in 2018. *See* 21st Century Cures Act, Pub. L. No. 114-255, § 15005, 130 Stat. 1033, 1320 (2016).

The rest happened just as expected. In 2017, the Secretary adjusted the base rate -3.9%. The agency met its goal. And then, in 2018, the Secretary adjusted the base rate -3.4412% — up 0.4588% from 2017.

That brings us to this case. Shortly after the -3.4412% adjustment took effect, Fresno Community Hospital and

Medical Center sued the Secretary, joined by 683 other Medicare providers. Their grievance? The -0.7% solution. In the hospitals' view, the Secretary should have reversed that expedient at the end of 2017. But instead, he carried it over into 2018 — costing the hospitals $840 million in lost payments. Appellants' Brief 42.

The district court dismissed for lack of jurisdiction, citing the judicial-review bar in § 7(b)(5) of the TMA, Abstinence Education, and QI Programs Extension Act of 2007.[2] We review that decision de novo. *See Am. Hosp. Ass'n v. Azar*, 895 F.3d 822, 825 (D.C. Cir. 2018).

II.

A.

Section 7(b)(5) bars "judicial review . . . of any . . . adjustments made under [§ 7(b)]" of the Act. This "specific language" defeats the presumption favoring review of agency action, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984), leaving a single question: whether the challenged action is "the sort shielded from review," *Amgen Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004).

Both the Act and the agency's 2018 Medicare rule suggest that it is. Start with the rule. According to the preamble, the Secretary finalized a "+0.4588 percentage point *adjustment*" for fiscal year 2018, as "required under" § 7(b)(1)(B). *See* 82 Fed. Reg. 37,990, 38,009 (Aug. 14, 2017) (emphasis added, capitalization omitted). And this tallies with the Act, which told

---

[2] Pub. L. No. 110-90, § 7(b)(4), 121 Stat. 984, 987 (2007), *amended by* § 414(3), 129 Stat. at 163. "Welcome to — and apologies for — the acronymic world of [Medicare] legislation." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017).

the Secretary to "make an . . . *adjustment* . . . of an increase of 0.4588 percentage points" for fiscal year 2018. § 7(b)(1)(B)(iii).[3]

Against all this, the hospitals insist that their quarrel is not with an "adjustment" but instead with the "continued inclusion of" (or "fail[ure] to reverse") a -0.7% "payment reduction." Appellants' Brief 3, 19. But it comes to the same thing.[4] To say that a -0.7% adjustment should have "expired" in 2017 is to say that the 2018 adjustment was off by 0.7%. *Id* at 25. Which is to say that the Secretary should have adjusted the 2018 base rate -2.7412% instead of -3.4412%. Yet that is just the sort of challenge that § 7(b)(5) forbids. Allowing such claims would "eviscerate the statutory bar," *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 506 (D.C. Cir. 2019), since almost any adjustment can be reframed as a "continued inclusion" or "fail[ure] to reverse."

Changing course, the hospitals assert that the review bar does not apply because the 2018 adjustment — or at least 0.7% of it — was not an "adjustment[] made under" § 7(b). The argument proceeds in four steps. Step one: § 7(b)(2) of the Act[5] forbids the Secretary to include one year's adjustment "in the determination of" future base rates. Step two: adjustments that

---

[3] 121 Stat. at 986, *amended by* § 414(1)(B), 129 Stat. at 163, *amended by* § 15005, 130 Stat. at 1320.

[4] "Even a beginner in mathematics knows that the distance between two points on the vertical axis is the same whether one measures down or up." Henry J. Friendly, *"Some Kind of Hearing,"* 123 U. Pa. L. Rev. 1267, 1295 (1975).

[5] "An adjustment made under [§ 7(b)(1)(B)] for discharges occurring in a year shall not be included in the determination of [base rates] for discharges occurring in a subsequent year." § 7(b)(2), 121 Stat. at 986.

violate § 7(b)(2) cease to be "adjustments made under" § 7(b). Step three: the -0.7% adjustment ran afoul of § 7(b)(2) when it carried over into 2018. Step four: because of this, the -0.7% adjustment falls outside the review bar. Appellants' Brief 34–35.

The hospitals' argument flatlines. Consider just one premise: the claim that adjustments that violate § 7(b)(2) are not "adjustments" for review-bar purposes. This idea recalls the old maxim *lex injusta non est lex*: an unjust law is not a law.[6] Whatever the merits of that jurisprudential theory, the hospitals' knockoff finds no textual support. Section 7(b)(2) says nothing about the review bar or about what counts as an "adjustment." Nor is there any hint that § 7(b)(2) can transform nonreviewable adjustments into reviewable nonadjustments. In the end, then, the hospitals' review-bar challenge rounds to zero.

As the Act and the 2018 rule show, the challenged action "lie[s] at the heart of [the Secretary's] authority." *Amgen*, 357 F.3d at 114. And because that action was "[a]n adjustment[] made under" § 7(b), § 7(b)(5) permits no further review.

## B.

But that is not quite the end of things. The hospitals also urge us to set aside the -0.7% adjustment as "ultra vires." Appellants' Brief 37–39. One way to state that surprising theory is this: "courts may disregard statutory bars on judicial review" when the agency has violated the underlying statute. *DCH*, 925 F.3d at 509. As *DCH* points out, putting it that way would essentially remove the statutory bar against judicial review. *Id.*

---

[6] *See, e.g.*, 28 St. Thomas Aquinas, *Summa Theologiæ*, I-II, Q. 96, art. 4 (Thomas Gilby ed., Cambridge Univ. Press 1966) (c. 1274) (quoting St. Augustine, *De Libero Arbitrio* bk. I, 5 (c. 389)).

Courts acknowledging the possibility of "ultra vires" review have therefore made it available only when an agency "plainly acts in excess of its delegated powers." *Id.* (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). But not just any interpretive skirmish will do: here the hospitals must show that the Secretary flouted a clear, specific, statutory command. *See id.*

Here again, the hospitals pin their hopes on § 7(b)(2). As they read it, that provision "bars the Secretary from allowing any recoupment adjustment to continue into a subsequent year." Appellants' Brief 44. By carrying over the -0.7% adjustment into 2018, the argument goes, the Secretary "violated an explicit statutory prohibition." *Id.* at 35.

That might be right if § 7(b)(2) forbade the Secretary to "apply" one year's adjustment to another year's base rate. Or to include it "in the adjustment of" future base rates. But that is not what the statute says. Instead, § 7(b)(2) tells the Secretary to exclude adjustments "*in the determination of*" future base rates (emphasis added). Yet the hospitals glide past these words without comment. At the same time, the hospitals read requirements into § 7(b)(2) — "expiration date[s]," "express[] prohibit[ions]" — that the text cannot bear. Reply Brief 5, 12. In short, to read § 7(b)(2) as the hospitals do, we would have to scrub up for statutory surgery, excising some words and engrafting others.

And then there is the puzzling upshot of the hospitals' rule. Recall that the Secretary adjusted the base rate -1.6% in fiscal year 2015. Here is how the Secretary's excellent brief explains it: the agency "made another -0.8% recoupment adjustment . . . in addition to *keeping the -0.8% adjustment from fiscal year 2014 in place.*" Appellee's Brief 16 (citing 79 Fed. Reg. 49,854, 49,874 (Aug. 22, 2014)) (emphasis added). Oddly, the hospitals

do not object to *this* carryover. Appellants' Brief 3. But that aside, a practical question arises: how could the Secretary effect gradual adjustments under the hospitals' rule? Must he zero out an adjustment on fiscal New Year's Eve, only to reimpose it once the clock strikes midnight? Section 7(b)(2) offers no textual basis for such meaningless contortions.

How, then, to make sense of § 7(b)(2)? Statutory context holds the answer. We are told that the phrase "determination of [base rates]" refers to the annual process of updating the base rate for inflation. *See Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011). The Medicare statute outlines that process, telling the Secretary how to calculate and apply the annual "percentage increase." 42 U.S.C. §§ 1395ww (d)(3)(A)(iv)(II); (b)(3)(B)(i)(XX); (b)(3)(B)(iii). And § 7(b)(2)? Read most naturally, § 7(b)(2) supplements those instructions, telling the Secretary to ignore recoupment adjustments when updating the base rate. Think of it this way. If updating the base rate is like reckoning a cost-of-living raise, then § 7(b)(2) tells the Secretary to calculate that raise using gross (not adjusted) pay.

It is amply clear that the 2018 adjustment did not violate § 7(b)(2), so we reject the hospitals' call to set that action aside. And because § 7(b)(2) does not forbid the Secretary to carry over adjustments, we need not address how that provision relates to § 7(b)(1)(B)(iii).

## C.

One final matter. Through dueling footnotes, the parties spar about our mandamus jurisdiction under the All Writs Act. Appellants' Brief 48 n.17; Appellees' Brief 49 n.7; Reply Brief 22 n.11. Footnotes, of course, are "no place to make a substantive legal argument on appeal." *CTS Corp. v. EPA*, 759

F.3d 52, 64 (D.C. Cir. 2014). But in any event, mandamus is proper only when there is an independent basis for jurisdiction and a "clear and indisputable" right to relief. *In re al-Nashiri*, 791 F.3d 71, 75, 78 (D.C. Cir. 2015) (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 381 (2004)). The hospitals have shown neither.

*

We do not doubt that the hospitals felt a "significant financial impact" from the -0.7% adjustment. Reply Brief 20. Nor that the adjustment has "last[ed] longer than [its] causes." Boswell, *Life of Johnson* 472 (Angus Calder ed., Wordsworth 2008) (1791); *see New Charleston Power I, L.P. v. FERC*, 56 F.3d 1430, 1431 (D.C. Cir. 1995). But such matters are not ours to resolve. Instead, our "limited role is to read and apply the law th[at] policymakers have ordained, and here our task is clear." *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020). The judgment of the district court is affirmed.

*So ordered.*