# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 17, 2020                    Decided July 17, 2020

No. 19-5352

AMERICAN HOSPITAL ASSOCIATION, ET AL.,
APPELLEES

v.

ALEX M. AZAR, II, IN HIS OFFICIAL CAPACITY AS SECRETARY
OF HEALTH AND HUMAN SERVICES,
APPELLANT

———

Consolidated with 19-5353, 19-5354

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-02841)
(No. 1:19-cv-00132)
(No. 1:19-cv-01745)

———

*Alisa B. Klein*, Attorney, U.S. Department of Justice, argued the cause for appellant. With her on the briefs were *Mark B. Stern*, Attorney, *Robert P. Charrow*, General Counsel, U.S. Department of Health & Human Services, *Janice L. Hoffman*, Associate General Counsel, *Susan Maxson Lyons*, Deputy Associate General Counsel for Litigation, and *Robert W. Balderston*, Attorney.

*Howard R. Rubin* and *Robert T. Smith* were on the brief for amici curiae Digestive Health Physicians Association, et al. in support of appellant.

*Catherine E. Stetson* argued the cause for appellees. With her on the brief were *Susan M. Cook*, *Katherine B. Wellington*, *Mark D. Polston*, *Joel McElvain*, *Christopher P. Kenny*, and *Michael LaBattaglia*. *Kyle Druding* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, GARLAND and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN*, Chief Judge*: Many hospitals provide outpatient care at off-site facilities known as "off-campus provider-based departments," or PBDs. Certain services offered by hospitals at off-campus PBDs, such as routine clinic visits, can also be provided by independent physician practices unaffiliated with a hospital. Although off-campus PBDs and independent physician practices can offer the same service, Medicare until recently reimbursed those providers at different rates: because off-campus PBDs are considered hospitals for regulatory purposes, they were paid a higher rate applicable to hospitals instead of a lower rate applicable to physician practices. The result was that, for the same outpatient service, off-campus PBDs obtained up to twice as much per patient in Medicare reimbursements as did physician practices.

The Department of Health and Human Services determined that the payment differential gave rise to an economic incentive that induced unnecessary growth in the volume of outpatient care provided at off-campus PBDs. HHS thus reduced the rate it paid hospitals for the most common off-campus PBD service, "patient evaluation and management," to

equal the rate paid to physician practices for that service. HHS justified that reimbursement cut as an exercise of its statutory authority to adopt "method[s] for controlling unnecessary increases in the volume" of covered outpatient services. 42 U.S.C. § 1395*l*(t)(2)(F).

A group of hospitals brought these consolidated actions, claiming that HHS's rate reduction for off-campus PBDs falls outside of the agency's statutory authority. The district court agreed and set aside the regulation implementing the rate reduction. Because we conclude that the regulation rests on a reasonable interpretation of HHS's statutory authority to adopt volume-control methods, we now reverse.

I.

A.

Medicare Part B health insurance covers outpatient hospital care, including same-day surgery, preventive and screening services, and physician visits. *See* 42 U.S.C. §§ 1395j, 1395k. The Department of Health and Human Services (HHS) sets the rates at which Medicare will reimburse hospitals for providing such services according to an intricate statutory system known as the Outpatient Prospective Payment System (OPPS). *See* 42 U.S.C. § 1395*l*(t).

Under the OPPS, hospitals are not reimbursed for the actual costs incurred in providing care. Instead, to help control Medicare expenditures, the statute calls for HHS to set predetermined payment amounts for each covered outpatient service. *See* H.R. Rep. No. 106-436, at 33 (1999). Hospitals then receive that amount for every instance in which they provide the service. OPPS rates are revised each year via notice-and-comment rulemaking and are published before they

go into effect.  *See Amgen, Inc. v. Smith*, 357 F.3d 103, 106 (D.C. Cir. 2004).

HHS generally sets the rates using a complex statutory formula.  First, each covered outpatient service (or group of related services) is assigned an Ambulatory Payment Classification (APC).  42 U.S.C. § 1395*l*(t)(2)(B).  HHS then establishes "relative payment weights" for each APC based on the median cost of providing the relevant services.  *Id.* § 1395*l*(t)(2)(C).  In that relative weighting process, HHS may decide, for instance, that given the cost to the hospital, a certain service should be reimbursed at twice the rate of a different service.  Next, each APC's relative weight is multiplied by a number known as the "conversion factor." *Id.* § 1395*l*(t)(3)(D).  The same conversion factor applies to all APCs.  *Id.*  Multiplying an APC's relative payment weight by the conversion factor produces a dollar amount, which is the base "fee schedule amount" for that APC.  *Id.* § 1395*l*(t)(4)(A).  That amount is subject to a variety of possible further adjustments, such as adjustments reflecting regional wage differences, *id.* § 1395*l*(t)(4)(A), or "outlier adjustments" for hospitals facing unusually high operating costs, *id*. § 1395*l*(t)(5).

When setting rates each year, HHS is required to reassess its choices:  what services or groups of services should make up each APC, what an APC's relative payment weight should be, and what statutory adjustments (such as for labor cost differences) should be applied.  *Id.* § 1395*l*(t)(9)(A).  Changes to any of those inputs will alter the payment rate for a particular service.  Any change HHS makes in those respects, however, must not cause overall projected expenditures for the next year to increase or decrease.  *Id.* § 1395*l*(t)(9)(B).  Under this "budget-neutrality" requirement, an increase or decrease in projected spending must be offset by other changes.

HHS must also update the conversion factor each year in order to keep up with inflation in general health care costs. *Id.* § 1395*l*(t)(3)(C)(ii), (t)(3)(C)(iv). Increases to the conversion factor, of course, proportionately increase overall OPPS outlays. But adjustments to the conversion factor need not be implemented in a budget-neutral manner—indeed, it would make little sense to do so in light of the objective of keeping pace with inflation.

The OPPS is designed to advance Congress's goal of controlling Medicare Part B costs in two ways. First, the OPPS encourages hospital efficiency by setting payment rates prospectively and basing the amount on median cost. Second, because of the budget-neutrality requirement, overall OPPS expenditure growth should closely track annual increases to the conversion factor. Those increases are modest and their amount is prescribed by statute.

Although HHS has significant control over the rate it will pay hospitals for a specific service under the OPPS system, the agency has little control over how frequently hospitals will provide that service. Consequently, even if payment rates remain constant, an increase in the amount of services provided will cause an increase in overall Medicare expenditures.

Congress addressed that possibility in subparagraph (2)(F) of the OPPS statute, the provision centrally in issue in this case. Subparagraph (2)(F) directs HHS to "develop a method for controlling unnecessary increases in the volume of covered [outpatient] services." *Id.* § 1395*l*(t)(2)(F). Relatedly, Congress also authorized HHS to reduce the conversion factor, thereby shrinking projected overall expenditures, if it "determines under methodologies described in [sub]paragraph (2)(F) that the volume of services paid for . . . increased beyond

amounts established through those methodologies." *Id.* § 1395*l*(t)(9)(C).

## B.

Some hospitals provide outpatient care at facilities known as off-campus provider-based departments (PBDs), which are located away from the physical site of the hospital. Off-campus PBDs are considered part of the hospital for regulatory purposes. *See* 42 C.F.R. § 413.65. For that reason, services provided at off-campus PBDs are reimbursed through the OPPS system. HHS thus has generally paid hospitals the same amount for outpatient care provided at an off-campus PBD as for outpatient care provided in the main hospital.

At least some services provided at off-campus PBDs can also be provided by freestanding physician offices, i.e., medical practices unaffiliated with a hospital. Physician offices are generally reimbursed at a lower rate for a given service than hospitals, because hospitals receive a separate "facility" rate inapplicable to freestanding physician practices. *See* Medicare Program: Proposed Changes to Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs, 83 Fed. Reg. 37,046, 37,142 (July 31, 2018).

Consider the amounts Medicare paid for a service commonly provided by off-campus PBDs: "evaluation and management of a patient," or E&M. In 2017, the E&M reimbursement rate for off-campus PBDs under the OPPS was $184.44 for new patients and $158.24 for established patients. By contrast, the 2017 E&M rate for freestanding physician offices—paid under a separate system known as the Physician Fee Schedule—was $109.46 for new patients and $73.93 for established patients. *See id.* Hospital-affiliated outpatient

departments thus received between 68% and 114% more in reimbursements per patient for the same service.

According to the Medicare Payment Advisory Commission (MedPAC), which was established by Congress to advise HHS, *see* Pub. L. No. 105-33 § 4022, 111 Stat. 251, 350, hospitals reacted to the incentive created by the payment differential between off-campus PBDs and independent physician practices. Almost a decade ago, hospitals began buying freestanding physician practices and converting them into off-campus PBDs, without much change in the facility or the patients served. MedPAC, *Report to the Congress: Medicare Payment Policy* 53, 59–61, 75–76 (Mar. 2014), https://go.usa.gov/xdCzV. MedPAC documented substantial increases in the provision of E&M services at hospital outpatient departments and little to no growth in the provision of the same services at physician offices. *See id.* at 42. From 2011 to 2016, the provision of E&M services at off-campus PBDs grew by 43.8%. MedPAC, *Report to the Congress: Medicare Payment Policy* 73 (2018), https://go.usa.gov/xdCzu. By comparison, the provision of E&M services at freestanding physician practices grew by only 0.4%. *Id.*

In 2015, Congress attempted to address the substantial growth in services provided at off-campus PBDs by enacting section 603 of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584, 597–98 (codified at 42 U.S.C. § 1395l(t)(21)). Section 603 adopted something of a compromise approach. On one hand, it did not touch the reimbursement rates for existing off-campus PBDs. On the other hand, it established that off-campus PBDs coming into existence after the statute's enactment would no longer be paid under the OPPS, but instead would be paid under the "applicable payment system under this part," which HHS interpreted to be a rate equivalent to the Physician Fee

Schedule. 42 U.S.C. § 1395l(t)(21)(C). That change applied to every service—not just E&M services—provided at new off-campus PBDs.

After section 603's enactment, though, HHS still continued to observe steady growth in the volume of hospital outpatient services. 83 Fed. Reg. at 37,139. For the years 2016 through 2018, the volume and intensity of services grew annually by 6.5%, 5.8%, and 5.4%, respectively. *Id.* And in its proposed OPPS rule setting rates for 2019, the agency projected that, without changes, volume would again increase by 5.3% in that year, leading to $75.3 billion in overall OPPS expenditures. *Id.* Outlays had been nearly $20 billion less only a few years earlier. *Id.*

HHS determined that, despite the 2015 enactment of section 603, "the differences in payment for . . . services" continued to be "a significant factor in the shift in services from the physician's office to the hospital outpatient department, . . . unnecessarily increasing hospital outpatient department volume." *Id.* at 37,142. HHS believed that the "higher payment that is made under the OPPS, as compared to payment under the [Physician Fee Schedule], [was] likely to be incentivizing providers to furnish care in the hospital outpatient setting." *Id.* at 37,141. Thus, although section 603 had removed the incentive for hospitals to purchase physician practices and convert them into off-campus PBDs on a going-forward basis, the statute did not remove the incentive to provide care in off-campus PBDs already in existence.

In its rule proposing 2019 OPPS rates, HHS announced that it "consider[ed] the shift of services" it had observed to be "unnecessary if the beneficiary can safely receive the same services in a lower cost setting but is instead receiving services in the higher paid setting due to payment incentives." *Id.* at

37,142. The agency concluded that E&M services, which are routine clinic visits, fit the bill, and thus that "the growth in clinic visits paid under the OPPS is unnecessary." *Id.*

Having found an "unnecessary increase[] in the volume of covered [outpatient] services," HHS proposed to exercise its subparagraph (2)(F) authority to "develop a method for controlling" the increase. 42 U.S.C. § 1395*l*(t)(2)(F); 83 Fed. Reg. at 37,142. Specifically, the agency proposed to cut E&M reimbursement rates to off-campus PBDs to the amount HHS pays to freestanding physician offices for providing the same service. "[C]apping the OPPS payment at the [Physician Fee Schedule]-equivalent rate," the agency explained, "would be an effective method to control the volume of these unnecessary services because the payment differential that is driving the site-of-service decision [would] be removed." 83 Fed. Reg. at 37,142.

Notably, HHS proposed to implement the E&M reimbursement cut in a non-budget-neutral manner. In other words, the agency would reduce payments without offsetting increases in reimbursements for other covered outpatient services. *Id.* at 37,142–43. Although the OPPS statute generally requires annual rate adjustments to be budget-neutral, *see* 42 U.S.C. § 1395*l*(t)(9)(B), the agency did not believe that requirement applied to methods for controlling volume under subparagraph (2)(F). 83 Fed. Reg. at 37,142–43. HHS chose not to apply the reimbursement cut in a budget-neutral manner because doing so "would not appropriately reduce the overall unnecessary volume of covered [outpatient] services, and instead would simply shift the movement of the volume within the OPPS system in the aggregate." *Id.* at 37,143. HHS estimated that the proposed rule would reduce Medicare's expenditures by approximately $610 million in 2019 alone,

with an additional $150 million saved by Medicare beneficiaries in the form of reduced coinsurance payments. *Id.*

After receiving comments, the agency adopted its proposal as a final rule, with the only change that the E&M reimbursement cut would be phased in over two years. *See* Medicare Program: Changes to Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs, 83 Fed. Reg. 58,818, 59,004–15 (Nov. 21, 2018).

## C.

The American Hospital Association and various hospitals (whom we will refer to collectively as the Hospitals) challenged the 2019 rule in these actions, which were consolidated in the district court for purposes of addressing the parties' cross-motions for summary judgment. *See Am. Hosp. Ass'n v. Azar*, 410 F. Supp. 3d 142, 146 (D.D.C. 2019). The Hospitals first argued that HHS's reduction in reimbursement for E&M services exceeded the agency's statutory authority because the reduction does not qualify as a "method for controlling unnecessary increases in . . . volume" under subparagraph (2)(F) of the OPPS statute. *See id.* at 150–51. The Hospitals also argued that HHS's decision to cut reimbursement to preexisting off-campus PBDs contravened Congress's decision to leave preexisting facilities unaddressed in section 603 of the Bipartisan Budget Act of 2015. *See id.*

The district court agreed with the Hospitals' first argument. *Id.* at 161. The court accordingly vacated as *ultra vires* the part of the challenged rule that reduced E&M reimbursement rates. *Id.* This appeal followed.

II.

We must first consider whether we have jurisdiction to review the Hospitals' claim. Subparagraph (12)(A) of the OPPS statute provides that "[t]here shall be no administrative or judicial review of" certain specified actions HHS takes in implementing the OPPS, including "the establishment of . . . methods described in paragraph (2)(F)." 42 U.S.C. § 1395*l*(t)(12)(A). The government contends that HHS's cut to E&M reimbursement qualifies as such a "method." Thus, the government argues, judicial review of that reimbursement cut is precluded by statute, and we should dispose of the case on that basis at the threshold without examining HHS's authority to implement the rate reduction.

We are unpersuaded. Although subparagraph (12)(A) forecloses judicial review of the agency's "establishment of methods described in paragraph (2)(F)," the Hospitals' claim is that the payment reduction at issue is *not* a "method[] described in paragraph (2)(F)" within the meaning of the statute. As a result, to determine whether the judicial-review bar applies in this case, we must decide whether the challenged agency action counts as a "method for controlling unnecessary increases in the volume of covered [outpatient] services." *Id.* § 1395*l*(t)(2)(F). And that latter question is the merits issue presented here.

Subparagraph (12)(A) therefore is a preclusion-of-review provision that "merges consideration of the legality of [agency] action with consideration of the court's jurisdiction in cases in which the challenge to the [agency's] action raises the question of the [agency's statutory] authority." *Amgen*, 357 F.3d at 113–14 (quoting *COMSAT Corp. v. FCC*, 114 F.3d 223, 226–27 (D.C. Cir. 1997)). In such cases, if the court "find[s] that [the agency] has acted outside the scope of its statutory

mandate, we also find that we have jurisdiction." *COMSAT*, 114 F.3d at 227. Put differently, "the jurisdiction-stripping provision does not apply" if the agency's action fails to qualify as the kind of action for which review is barred. *Southwest Airlines Co. v. TSA*, 554 F.3d 1065, 1071 (D.C. Cir. 2009). As a practical matter, then, the court can simply skip to the merits question in its analysis. *See, e.g.*, *id.*; *Amgen*, 357 F.3d at 114; *COMSAT*, 114 F.3d at 227.

This court has already construed the provision at issue here as "merging" the preclusion and merits analysis in that way. In *Amgen*, we stated that subparagraph (12)(A)'s preclusion on review of "other adjustments" to rates by HHS "extends no further than the Secretary's statutory authority to make" such adjustments. 357 F.3d at 112. Accordingly, we concluded that subparagraph (12)(A) "precludes judicial review of any adjustment made by the Secretary pursuant to [his statutory] authority . . . but not of those for which such authority is lacking." *Id.* at 113. We then proceeded to the merits question, ultimately holding that the challenged adjustment was within the agency's statutory authority and that we thus lacked jurisdiction. *Id.* at 114, 118. The government contends that *Amgen*'s treatment of subparagraph (12)(A) was dicta, but regardless, we fully agree with *Amgen*'s approach, under which we analyze the merits to decide whether we have jurisdiction.

The government attempts to sidestep that result by pressing us to analyze the Hospitals' claim under the '*ultra vires* review' doctrine often attributed to *Leedom v. Kyne*, 358 U.S. 184 (1958). That doctrine, which we have likened to a "Hail Mary pass," "permits, in certain limited circumstances, judicial review of agency action for alleged statutory violations even when a statute precludes review." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009). The government submits that the Hospitals' challenge presents

such a circumstance and thus must satisfy the stringent requirements set out in *DCH Regional Medical Center v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)—among them, that the agency plainly acted in excess of its delegated powers and contrary to a specific, clear, and mandatory prohibition in the statute. *Id.*

The Hospitals' challenge does not implicate the *Kyne* framework. We are not asked to remedy a "statutory violation[] even when a statute precludes review." *Nyunt*, 589 F.3d at 449. Instead, the Hospitals argue that the "same agency error . . . simultaneously ma[kes] the jurisdictional bar inapplicable and compel[s] setting aside the challenged agency action." *DCH Regional*, 925 F.3d at 510 (quotation marks omitted). Put differently, the Hospitals' claim is that subparagraph (12)(A)'s bar on judicial review does not apply if their merits argument is correct, not that their merits argument is so obviously correct that we should consider it despite an applicable bar on our review. *DCH Regional* itself recognized the distinction between cases involving a "*Kyne* exception" and cases such as this one in which "the relevant statutory bar . . . [is] effectively coextensive with the merits." *Id.* at 509–10.

In sum, subparagraph (12)(A)'s bar on judicial review is inapplicable unless HHS's challenged action qualifies as a "method for controlling unnecessary increases in . . . volume" under subparagraph (2)(F). Subparagraph (12)(A) then ultimately does not preclude judicial scrutiny of HHS's action for consistency with subparagraph (2)(F). To be sure, subparagraph (12)(A) still forecloses inquiry into "whether [the] challenged agency decision is arbitrary, capricious, or procedurally defective." *Amgen*, 357 F.3d at 113. But such claims are not before us here. As to the claim the Hospitals do raise, the question whether the Hospitals are correct and the

question whether the preclusion provision bars review of their claim are one and the same.  We thus turn to assessing whether HHS had statutory authority to implement the challenged E&M reimbursement reduction.

III.

A.

We examine that question under the traditional *Chevron* framework, under which we defer to the agency's reasonable interpretation of an ambiguous statute.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  HHS is generally entitled to *Chevron* deference on judicial review of its interpretations of the Medicare statute.  *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 414 (1993); *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 92 (D.C. Cir. 2020).  The Hospitals urge us not to apply *Chevron* in this case for several reasons, none of which is persuasive.

First, we disagree that HHS forfeited any right to *Chevron* deference.  To the contrary, HHS explained in the district court why its interpretation was entitled to *Chevron* treatment, invoked the doctrine twice in its opening brief in our court, and argued for it again in its reply brief.  And in any event, our decisions hold that *Chevron* deference is not subject to forfeiture based on an agency's litigation conduct if the agency's challenged action "interpret[ed] a statute it is charged with administering in a manner (and through a process) evincing an exercise of its lawmaking authority." *SoundExchange, Inc. v. Copyright Royalty Bd.*, 904 F.3d 41, 54 (D.C. Cir. 2018).  That is the case here.  *See* 83 Fed. Reg. at 59,009, 59,011.

Second, the Hospitals contend that HHS's interpretation of subparagraph (2)(F) in the challenged rule is inconsistent with earlier agency pronouncements, such that the rule is arbitrary and unworthy of *Chevron* deference. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). But HHS has never taken a definitive position on the scope of subparagraph (2)(F). The Hospitals point to one sentence in the agency's first OPPS rulemaking cautioning that "[a]dditional study, analysis, and possible legislative modification would be necessary before [the agency] could consider implementing" a volume-control method involving direct changes to reimbursement. Medicare Program; Prospective Payment System for Hospital Outpatient Services, 63 Fed. Reg. 47,552, 47,586 (Sept. 8, 1998). Even assuming that statement amounted to an announcement of agency policy, which is far from clear, its meaning is ambiguous. As the district court concluded in its decision, the agency might well have thought that a "possible legislative modification would be necessary" because its proposed volume-control method would have required amending a separate statutory formula pertaining to its proposal, not because it believed that direct rate changes could never qualify as a "method for controlling" volume under (2)(F). *See Am. Hosp. Ass'n*, 410 F. Supp. 3d at 157 n.8.

Nor, contrary to the Hospitals' contention, has HHS long viewed subparagraph (2)(F) to require volume-control methods to be budget-neutral. It is true that the agency previously implemented a volume-control method called "packaging," which bundles related services together into a single payment group, in a budget-neutral manner. *See* Medicare Program: Changes to the Hospital Outpatient Prospective Payment System and CY 2008 Payment Rates, 72 Fed. Reg. 66,580, 66,615 (Nov. 27, 2007). That example, though, does not establish that HHS viewed (2)(F) as requiring budget-neutrality. The agency implemented "packaging" via other

statutory authorities, including its power to alter the composition of APC groups and their scaled weights. *See id.*at 66,611, 66,615; 42 U.S.C. § 1395*l*(t)(2)(B)–(C), (t)(9)(A). Those adjustment authorities require budget-neutrality. *See* 42 U.S.C. § 1395*l*(t)(9)(B). HHS implemented packaging in a budget-neutral way not because it was a (2)(F) method, but because it involved other statutory adjustments that call for budget-neutrality. *See* 72 Fed. Reg. at 66,615 (budget-neutrality implicated because of "changes in APC weights and codes" and resulting "shifts in median costs" of those APCs).

Finally, we reject the Hospitals' argument that *Chevron* does not apply when, as here, our consideration of the agency's statutory authority merges with our consideration of the applicability of a preclusion provision. *See* Part II, *supra*. That result would mean that Congress's decision to enact a preclusion provision operated to enhance judicial scrutiny and restrict the agency's leeway. In precluding judicial review of certain HHS actions, though, Congress necessarily intended the opposite outcome. *See Amgen*, 357 F.3d at 112 (noting "havoc that piecemeal [judicial] review of OPPS payments could bring about").

B.

Having rejected the Hospitals' arguments against applying *Chevron*, we proceed to review HHS's interpretation of subparagraph 1395*l*(t)(2)(F) under *Chevron's* two-step framework. We first ask whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, our work is done, for we "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843. But if the statute is "silent or ambiguous with respect to th[at] specific issue," *id.*, we assume "Congress has empowered the

agency to resolve the ambiguity," and we defer to the agency's interpretation as long as it is reasonable. *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 315 (2014).

The question at issue is whether HHS may reduce the OPPS reimbursement for a specific service, and may implement that cut in a non-budget-neutral manner, as a "method for controlling unnecessary increases in the volume of" the service. 42 U.S.C. § 1395*l*(t)(2)(F). In our view, Congress did not "unambiguously forbid" the agency from doing so. *Barnhart v. Walton*, 535 U.S. 212, 218 (2002); *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1125 (D.C. Cir. 2013). We further conclude that the agency reasonably read subparagraph (2)(F) to allow a service-specific, non-budget-neutral reimbursement cut in the circumstances we consider here. We therefore hold that the agency acted within its statutory authority.

1.

At step one of *Chevron*, "the court begins with the text, and employs 'traditional tools of statutory construction' to determine whether Congress has spoken directly to the issue." *Prime Time Intern. Co v. Vilsack*, 599 F.3d 678, 683 (D.C. Cir. 2010) (quoting *Chevron*, 467 U.S. at 842–43 & n.9). Applying those tools, we conclude that the OPPS statute does not directly foreclose HHS's challenged rate reduction.

To begin with, a service-specific, non-budget-neutral rate reduction falls comfortably within the plain text of subparagraph (2)(F). Reducing the payment rate for a particular OPPS service readily qualifies, in common parlance, as a "method for controlling unnecessary increases in the volume" of that service. The lower the reimbursement rate for a service, the less the incentive to provide it, all else being

equal. Reducing the reimbursement rate thus is naturally suited to addressing unnecessary increases in the overall volume of a service provided by hospitals. As for whether a rate reduction under subparagraph (2)(F) can be non-budget-neutral, the provision simply says nothing about budget-neutrality. The text Congress enacted thus lends considerable support to the agency's reading of the statute at *Chevron* step one. *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 4 (D.C. Cir. 1999) (because operative "language d[id] not preclude the [agency's] interpretation," the contrary "inference petitioner would draw as to the statute's meaning [was] not inevitable").

The broader statutory context bolsters the agency's view that subparagraph (2)(F) authorizes service-specific rate cuts. Under our decision in *Amgen*, the agency can alter the reimbursement rate for a particular service under its subparagraph (2)(E) authority to make "adjustments [it] determine[s] to be necessary to ensure equitable payments," 42 U.S.C. § 1395*l*(t)(2)(E); *see* 357 F.3d at 117 (upholding use of equitable-adjustment authority to change "payment amount for a single drug"). If the agency can adjust payment rates in furtherance of the expansive purpose of achieving equitable payments, it stands to reason that the agency can also adjust rates to accomplish the more focused goal of controlling unnecessary volume growth. Indeed, as the *Amgen* court saw it, HHS's robust "discretion" to adjust payment rates is a central feature of the statutory scheme. 357 F.3d at 114 (quoting H.R. Rep. No. 105-149, at 1323 (1997) and H.R. Conf. Rep. No. 105-217, at 785 (1997)).

The statutory context also supports construing subparagraph (2)(F) to allow non-budget-neutral adjustments. If the statute otherwise permits the agency to make a discretionary rate reduction as a method of volume control, it would be anomalous for the law to require the rate cut to be

implemented budget-neutrally. That would require HHS to redistribute the costs traceable to the provision of unnecessary services throughout the OPPS, resulting in no net savings to Medicare and largely negating the point of reducing reimbursement in the first place. *See* 83 Fed. Reg. at 37,142–43.

The Hospitals warn that, on that reading, nothing "prevents [HHS] from engaging in cost-control measures that will disproportionately affect only some service providers and beneficiaries." Hospitals Br. 7. But budget-neutrality offers little protection against such outcomes. If HHS reduces reimbursements for cardiac catheterizations and then redistributes the savings across the OPPS, that still hurts cardiologists much more than orthopedists even if cardiologists would get some money back in the form of slightly elevated reimbursements for other services they provide. The agency's ability to advance Congress's apparent goals in both budget-neutrality and subparagraph (2)(F)—namely, keeping growth in overall OPPS expenditures modest and predictable year to year, *see generally supra* pp. 5–6—would be undermined, not advanced, by requiring the savings from (2)(F) volume-control methods to be redistributed across the OPPS.

The Hospitals also contend that, budget-neutrality aside, subparagraph (2)(F) unambiguously does not encompass service-specific rate adjustments. The Hospitals argue in that regard that subparagraph (2)(F) does no more than enable the agency to develop an "analytical mechanism for determining whether there is an unnecessary increase in volume." Hospitals Br. 31 (formatting modified). That argument rests on reading subparagraph (2)(F) in conjunction with subparagraph (9)(C), which provides that:

> If the Secretary determines under methodologies described in paragraph (2)(F) that the volume of services paid for under this subsection increased beyond amounts established through those methodologies, the Secretary may appropriately adjust the update to the conversion factor otherwise applicable in a subsequent year.

42 U.S.C. § 1395*l*(t)(9)(C).

According to the Hospitals, subparagraph (9)(C) is the exclusive way for HHS to implement subparagraph (2)(F). On that understanding, (2)(F) empowers the agency to "develop a method" for diagnosing whether there has been too much growth in outpatient service volume, and if the agency decides there has, then it can respond by—and only by—using its (9)(C) authority to reduce the across-the-board conversion factor. (Recall that the conversion factor is the number by which relative payment weights for services are translated into actual reimbursement amounts. *See supra* pp. 4–5.) Subparagraph (2)(F), under the Hospitals' argument, does not itself authorize the agency to act on an unnecessary increase in volume upon finding that one exists, much less to do so on a service-specific basis. Rather, the agency can act only by reducing the overall conversion factor under (9)(C).

That interpretation of subparagraph (2)(F) is difficult to square with the provision's language. Subparagraph (2)(F) directs the agency to develop "a method for *controlling* unnecessary increases" in volume, not just a method for *assessing* whether unnecessary increases exist. And we think it unlikely that Congress would have confined the agency's volume-control arsenal to the very blunt instrument of reducing the across-the-board conversion factor. The Hospitals identify

no reason to suppose that Congress would have been concerned only about *overall* OPPS volume growth, which the conversion factor can suitably address, but not about unwarranted growth in the volume of a single service, which the conversion factor cannot. Cutting the conversion factor would reduce reimbursement equally for every OPPS service, a poorly tailored, ineffectual "method" of controlling undesirable volume growth in a specific service.

The Hospitals respond that HHS's reading of (2)(F) renders subparagraph (9)(C) redundant, because cutting the conversion factor fits textually as a "method for controlling" unnecessary volume. We do not see the redundancy. Subparagraph (9)(C) appears to come into play only after the agency first attempts to address unnecessary volume increases through methodologies implemented under subparagraph (2)(F): "If the Secretary determines under methodologies described in paragraph (2)(F) that" volume has "increased *beyond amounts established through those methodologies*, the Secretary may appropriately adjust the update to the conversion factor applicable in a *subsequent* year." 42 U.S.C. § 1395*l*(t)(9)(C) (emphases added). Because the (9)(C) authority thus kicks in only after the (2)(F) authority has been attempted and found inadequate, the former necessarily is not redundant of the latter.

At any rate, even if subparagraph (9)(C) did amount to surplusage under HHS's reading of (2)(F), that would not necessarily compel rejecting the agency's interpretation of (2)(F) at *Chevron* step one. "[A]t times Congress drafts provisions that appear duplicative of others—simply, in Macbeth's words, 'to make assurance double sure.'" *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Human Servs.*, 830 F.3d 515, 520 (D.C. Cir. 2016) (citation omitted)). There may have been particular reason for Congress to do so here. In

specifying how HHS is to calculate the conversion factor, the statute envisions that the conversion factor will generally be "increased" each year, 42 U.S.C. § 1395*l*(t)(3)(C), (t)(3)(C)(ii). In that light, Congress could have thought it desirable to confirm the agency's power to *reduce* the conversion factor in response to volume growth, as subparagraph (9)(C) does.

Next, the Hospitals argue that subparagraph (2)(F)'s silence on budget-neutrality is itself evidence that Congress could not have intended the provision to allow direct rate adjustments. As noted, subparagraph (2)(F) does not address whether volume-control "method[s]" under that provision must be implemented in a budget-neutral fashion. Yet the OPPS statute nearly always specifies, one way or the other, whether a rate-adjustment authority must be exercised budget-neutrally. *See Am. Hosp. Ass'n*, 410 F. Supp. 3d at 159 (citing provisions). To the Hospitals, subparagraph (2)(F)'s comparative silence indicates that Congress did not intend the provision to authorize changes to payment rates.

But subparagraph (2)(F) undisputedly authorizes actions *other* than direct rate adjustments, and for at least some of those actions, a budget-neutrality requirement would make no sense. For example, the Hospitals do not dispute that subparagraph (2)(F) would allow HHS, as a volume-control method, to require additional paperwork from hospitals seeking reimbursement for certain outpatient procedures. That kind of volume-control method, of course, is insusceptible to a budget-neutrality mandate. Thus, (2)(F)'s silence on budget-neutrality tells us little about whether (2)(F) includes the authority to reduce a particular OPPS rate.

Lastly, the Hospitals make a similar argument based on paragraph 1395*l*(t)(4), which sets out how "[t]he amount of payment made from the Trust Fund under this part for a

covered [outpatient] service . . . furnished in a year is determined." 42 U.S.C. § 1395*l*(t)(4). Paragraph (4) makes no mention of subparagraph (2)(F). But it expressly allows payment amounts to be "adjusted" under other provisions, such as subparagraphs (2)(D) and (2)(E), which authorize various adjustments including labor-cost adjustments and equitable adjustments. That, the Hospitals contend, is strong evidence that Congress did not intend direct modification of OPPS payment rates via subparagraph (2)(F).

Text and precedent, however, indicate that not all changes to OPPS rates must flow through paragraph (4). A number of provisions in the OPPS statute authorize HHS to set or adjust reimbursement rates for specific outpatient services but are unaddressed by paragraph (4). *See* 42 U.S.C. § 1395*l*(t)(14) (providing separate formula for calculating "amount of payment under this subsection for a specified covered outpatient drug"); *id.* § 1395*l*(t)(15) (prescribing "amount [to be] provided for payment for [an ungrouped] drug or biological under this part"); *id.* § 1395*l*(t)(16)(D) (requiring payment reduction for a certain surgical procedure performed by certain hospitals); *id.* § 1395*l*(t)(16)(F)(i)–(ii) (requiring payment reductions for various imaging services); *id.* § 1395*l*(t)(22) (authorizing Secretary to make "revisions to payments" "made under this subsection for covered [outpatient] services" in order to decrease opioid prescriptions). Consequently, paragraph (4) is best understood to set out only the general mechanism—not the exclusive mechanism—by which specific OPPS rates for covered services are "determined."

Our decision in *Amgen* supports that understanding of paragraph (4). In that case, HHS used its equitable-adjustment authority under subparagraph (2)(E) to reduce a "transitional pass-through" payment for a drug to zero dollars. 357 F.3d at 107. The drug's manufacturer complained that HHS could not

make that sort of equitable adjustment because paragraph (t)(6) lays out a specific formula for determining the "amount of the [transitional pass-through] payment." *See* 42 U.S.C. § 1395*l*(t)(6)(A), 1395*l*(t)(6)(D). *Amgen* rejected that argument, holding that (t)(6)'s seemingly "mandatory" provisions establish only "default OPPS rate calculations subject to later adjustment." 357 F.3d at 115. Under *Amgen*, then, although (t)(6) specifies in detail how pass-through payments must be calculated without mentioning subparagraph (2)(E), the agency can nonetheless adjust the results of the (t)(6) formula using its (2)(E) authority. The same, we think, is true—or at least, not unambiguously untrue—of (t)(4) and (2)(F), respectively.

We thus conclude that the OPPS statute does not unambiguously foreclose HHS's adoption of a service-specific, non-budget-neutral rate cut as a "method for controlling unnecessary increases in" volume. 42 U.S.C. § 1395*l*(t)(2)(F). The statute is at least ambiguous as to whether that sort of rate adjustment lies within the agency's (2)(F) authority.

2.

At *Chevron* step two, we ask whether the agency's interpretation "is based on a permissible construction of the statute." *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1128 (D.C. Cir. 2013) (quoting *Chevron*, 467 U.S. at 843). "A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made." *Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) (citation omitted).

The challenged rule meets that standard. The agency explained that recent growth in the volume of E&M services

provided at off-campus PBDs was "unnecessary because it appears to have been incentivized by the difference in payment for each setting rather than patient acuity." 83 Fed. Reg. at 59,007. The agency further concluded that reducing payments in order to eliminate that incentive "would be an effective method to control the volume of these unnecessary services because the payment differential that is driving the site-of-service decision will be removed." *Id.* at 59,009.

That interpretation of subparagraph (2)(F) is both "textually defensible" and "fits 'the design of the statute as a whole and . . . its object and policy.'" *Good Samaritan Hosp.*, 508 U.S. at 418, 419 (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990)). It is reasonable to think that Congress, which cared enough about unnecessary volume to instruct the agency to "develop a method for controlling" it, would have wanted the agency to avoid causing unnecessary volume growth with its own reimbursement practices. We thus defer to the agency's conclusion that (2)(F) allowed it to address that problem by reducing a specific rate.

Sustaining HHS's challenged reduction in this case would not necessarily leave the agency free "to set any payment rate for any service, without regard to the fine-grained statutory scheme enacted by Congress." Hospitals Br. 45. It is one thing for HHS to use its subparagraph (2)(F) authority to eliminate a volume-growth incentive created, in the agency's view, by a differential in its own payment rates. It may be another thing for the agency to reduce payment for a service under (2)(F) merely because doing so would decrease volume that HHS decides is "unnecessary." We have no occasion to decide whether an action of that kind would rest on a reasonable interpretation of the OPPS statute. *Cf. Nat. Res. Def. Council v. EPA.*, 777 F.3d 456, 469 (D.C. Cir. 2014) (agency's interpretation cannot be "untethered to Congress's approach"

at *Chevron* step two); *Amgen*, 357 F.3d at 117 (equitable adjustments may not "work basic and fundamental changes in the scheme Congress created in the Medicare Act" (quotation omitted)).

In short, we conclude under *Chevron* that HHS's reduction in reimbursement for E&M services provided by off-campus PBDs qualifies as a "method for controlling unnecessary increases in the volume of covered [outpatient] services." 42 U.S.C. § 1395*l*(t)(2)(F). Because the challenged rate cut is thus a "method[] described in paragraph (2)(F)," judicial review of that action is precluded by the statute. *See id.* § 1395*l*(t)(12)(A). Consequently, neither we nor the district court has jurisdiction over the Hospitals' challenge.

## IV.

The Hospitals argue in the alternative that HHS's decision to reduce E&M reimbursement to off-campus PBDs contravenes section 603 of the Bipartisan Budget Act of 2015. As explained, Congress enacted that provision in response to reports that the payment differential between off-campus PBDs and freestanding physician practices had induced hospitals to purchase those practices. Section 603 established that services performed at off-campus PBDs would no longer be paid under the OPPS but instead would be paid under a scheme approximating the Physician Fee Schedule. *See* 42 U.S.C. § 1395*l*(t)(1)(B)(v), 1395*l*(t)(21)(C). But the law exempted "department[s] of a provider . . . that [furnished covered outpatient services] prior to November 2, 2015." *Id.* § 1395*l*(t)(21)(B)(ii). In the Hospitals' view, Congress's decision to leave the rates paid to preexisting off-campus PBDs unaddressed in section 603 means that the statute should be read to bar HHS from cutting reimbursement rates for those facilities.

Because the Hospitals' section 603 argument targets agency action we have already determined qualifies as a "method[] described in paragraph (2)(F)," we are doubtful we have jurisdiction to consider it. *See id.* § 1395*l*(t)(12)(A). In any event, we reject the argument on the merits. (The law of our circuit allows a court to assume hypothetical *statutory* jurisdiction even if we cannot assume Article III jurisdiction. *See Kramer v. Gates*, 481 F.3d 788, 791 (D.C. Cir. 2007).) Nothing in the text of section 603 indicates that preexisting off-campus PBDs are forever exempt from adjustments to their reimbursement. Rather, the text of the law exempts those providers from the change mandated by section 603 itself, leaving the exempted providers subject to all the provisions of the OPPS statute, including subparagraph (2)(F). It bears noting, moreover, that section 603's exemption of preexisting off-campus PBDs from the reimbursement reductions effected by that statute retains practical effect for all OPPS services except the one type of service (E&M services) addressed by the challenged rule.

Trying a different approach, the Hospitals contend that section 603 demonstrates Congress's judgment that increases in volume at preexisting off-campus PBDs are not "unnecessary" in the sense contemplated by subparagraph (2)(F). But even assuming that were true for increases in volume occurring by 2015, when section 603 was enacted, it would not mean that Congress considered acceptable the continued volume increases later taking place in 2016, 2017, or 2018, on which HHS relied in adopting the challenged rule. *See* 83 Fed. Reg. at 37,139; MedPAC, *Report to the Congress: Medicare Payment Policy* 73 (Mar. 2018), https://go.usa.gov/xdCzu. Section 603 thus does not stand in the way of the agency's challenged rate reduction under (2)(F).

28

\* \* \* \* \*

For the foregoing reasons, we reverse the judgment of the district court.

*So ordered.*